Marshall Silberberg, Esq. (SBN 58303)
William S. Collins, Esq., (SBN 289877)
LAW OFFICES OF MARSHALL SILBERBERG
3333 Michelson Drive, Suite 710
Irvine, CA 92612
Tel: (949) 718-0960/Fax: (949) 266-5811

Attorneys for Plaintiff,
S.A., a minor, BY AND THROUGH
HER GUARDIAN AD LITEM EHSAN AL SABAHI

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| S.A., a minor, BY AND THROUGH HER GUARDIAN AD LITEM EHSAN AL SABAHI | CASE NO.: 18-CV-61-TWR-WVG |
| | Complaint Filed: 01/09/2018 |
| Plaintiff, | Trial: February 6-9, 2023 |
| vs. | **PLAINTIFF'S POST TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| UNITED STATES OF AMERICA; LA MAESTRA COMMUNITY HEALTH CENTERS; SETAREH JONES, MD; and DOES 1 to 30, inclusive, | |
| Defendants. | |

## I.   INTRODUCTION AND FACTUAL BACKGROUND

This is a medical negligence action involving the care and treatment of Shams Al Sabahi by Defendants, Setareh Jones, M.D., and the United States of America.  Specifically, this case involves the negligent failure to properly and timely evaluate, work up and diagnose Shams Al Sabahi's complaints of chronic and progressing headaches, which were caused by an intracranial aneurysm. Defendant's negligence resulted in the aneurysm rupturing, causing catastrophic brain damage to Shams Al Sabahi.   Trial took place February 6, 2023, through February 9, 2023, before the Honorable Ruth Bermudez Montenegro.  Judge Montenegro ordered the parties to submit Findings

1

1    of Fact and Conclusions of Law no later than February 21, 2023.

2    **II.    FINDINGS OF FACT**

3         1.    On January 28, 2014, Shams Al Sabahi ("Shams") presented to her optometrist,

4    Amaal Odish, O.D., for contact lens examination.  Dr. Odish noted that Shams complained of

5    "frequent headaches." **(Joint Exhibit No. 7)**

6         2.    On September 22, 2014, Shams was evaluated at African Alliance Health Clinic.

7    On that date she complained of "headache around temporal region once of [sic] twice a month that

8    is relieved with OTC Aleve."  She was prescribed a quantity of 60 Ibuprofen 600 mg oral tablets for

9    her headaches. **(Joint Exhibit 10.)**

10        3.    Shams returned to African Alliance Health Clinic on November 11, 2014.  Once

11   again, she complained of "intermittent unilateral headaches, described as throbbing," but without

12   nausea and photophobia.  It was also noted "she has been taking ibuprofen 1-2 times a day when her

13   headache occurs, but continues to have the headache couple times a week."  Shams was prescribed

14   Topiramate, which is a medication used to prevent the occurrence of headache or migraine. **(Joint**

15   **Exhibit 11.)**

16        4.    On February 11, 2015, Shams established care at La Maestra Community Health

17   Centers in El Cajon ("La Maestra").  She was evaluated by Dr. Setareh Jones ("Dr. Jones") at each

18   visit.  Shams reported she was taking ibuprofen for her migraine headaches.  It was also noted that

19   "migraines diagnosed over past year, occurred almost every day, now occurring 1-4 times a month."

20    She also reported she had "been taking ibuprofen 600 mg," and that Tylenol had not worked in the

21   past. Her headache was "right sided throbbing," with **sensitivity to light and sound**."  She had no

22   family history of migraine.  Dr. Jones diagnosed Shams with migraines and prescribed Sumatriptan,

23   which is a migraine abortive, designed to be taken after a migraine occurs.     Finally, Dr. Jones

24   noted that Shams was previously on a daily prophylactic medication of "unknown name," which she

25   "may need again." **(Joint Exhibit 14.)**

26        5.    Dr. Jones testified at trial that a patient with migraines, who then develops

27   photophobia and phonophobia constitutes a change of condition, which requires referral to a

28   specialist pursuant to the "guidelines." **(Trial Testimony, Dr. Jones, 70:12-71:20.)**  The reports of

2

1  photophobia and phonophobia were new symptoms, that had developed after Shams was seen on
2  November 11, 2014, at African Alliance Health Clinic.   No referral was ordered by Dr. Jones. **(See**
3  **Joint Exhibit 11.**)

4      6.      Dr. Jones did not have any of the African Alliance Health Clinic records at the
5  February 11, 2015, office visit at La Maestra, nor was she aware that Shams was taking Topiramate
6  for her headaches.  Dr. Jones never requested or obtained the African Alliance records. **(Trial**
7  **Testimony, Dr. Jones, 75:11-15, 83:9-15.**)

8      7.      Dr. Contini, plaintiff's expert pediatrician, explained at trial that it is unusual for
9  pediatric patients to take a daily prophylactic medication for headache, as most pediatric headaches
10  are episodic. **(Trial Testimony, Dr. Contini, 290:21-291:2.**)

11      8.      The same day Shams saw Dr. Jones, February 11, 2015, she filled prescriptions for
12  Topiramate and Sumatriptan.  Joint Exhibit 45 indicates that as of February 11, 2015, Shams had
13  filled prescriptions for a preventative medication (Topiramate) and an abortive medication
14  (Sumatriptan.) **(Joint Exhibit 45.**)

15      9.      Shams returned to see Dr. Jones at La Maestra on March 30, 2015.  The note reflects
16  this visit was for a follow-up of her headache.  Dr. Jones noted the problem was moderate, but
17  improving, with the frequency once per week.  At the same time, Dr. Jones noted that sumatriptan
18  did not work, and that Shams was taking "2 ibuprofen 600 mg tablets for headache at onset," about
19  once a week.  The record clearly indicates that Shams was taking 1,200 mg of ibuprofen for her
20  headaches once a week.  The frequency of her headaches on March 30, 2015, were the same or
21  more frequent than February 11, 2015. **(Joint Exhibit 16.**)

22      10.     On March 30, 2015, Dr. Jones diagnosed Shams with "migraine, unspecified,
23  without mention of intractable migraine, without mention of status migrainosus (346.90)."  Her
24  impression was "improved," but told Shams to take prescription ibuprofen 600 mg every 8 hours as
25  needed for headache, and "NOT" to exceed maximum dose. Dr. Jones did not order a referral to a
26  neurologist or an order for imaging of Shams's brain at this visit. **(Joint Exhibit 16.**)

27      11.     According to Joint Exhibit 71, the headache Algorithm from Rady Children's
28  Hospital, if a patient fails headache treatment with topiramate, a referral to a specialist is indicated.

1  (**Joint Exhibit 71.**)

2      12.     Dr. Contini testified that ibuprofen is a first line drug for headache, and works 90

3  percent of the time. (**Trial Testimony, Dr. Contini, 287:8-20.**)

4      13.     Next, Shams saw Dr. Jones on June 22, 2015.    Her complaint was related to

5  abdominal pain.  There was no evaluation of headache or any questions about headache in the note.

6  Dr. Jones's assessment was "Gastritis," most likely GERD or H. Pylori.  Dr. Jones recommended

7  Zantac for Shams's symptoms.  The record is silent as to Shams's headaches or complaints thereof.

8  (**Joint Exhibit 18.**)

9      14.     Dr. Dern, Dr. Jones's expert pediatrician, testified at trial that gastritis may be related

10 to overuse of Ibuprofen by Shams. (**Trial Testimony, Dr. Dern, 633:25-634:3.**)   Dr. Contini

11 agreed that Shams was taking too much ibuprofen. (**Trial Testimony, Dr. Contini, 309:2-4**)

12      15     On November 17, 2015, Shams refilled a prescription for a quantify of 30, 600 mg

13 ibuprofen tablets at the pharmacy. This was approved by Dr. Jones with instructions to take one

14 tablet by mouth every 6-8 hours for headache.  (**Joint Exhibits 19 and 46.**)

15      16.     On November 21, 2015, Shams refilled another prescription for 30, 600 mg

16 ibuprofen tablets at the pharmacy, which was approved by Dr. Jones. (**Joint Exhibit 46.**)

17      17.     On July 29, 2016, Shams attempted to refill her prescription for ibuprofen 600mg

18 twice.  First, at 10:56 AM, she attempted a refill, but that request was denied by Dr. Jones because

19 "patient needs an appointment."   Second, at 11:26 AM, she again attempted to refill her

20 prescription, but that was denied by Dr. Jones because "patient needs an appointment." (**Joint**

21 **Exhibit 21, pgs 6 & 8.**)

22      18.     On August 1, 2016, Shams again attempted to refill her prescription for ibuprofen

23 600mg two times.  Specifically, attempts were made at 12:58 PM and 1:28 PM, with both being

24 denied by Dr. Jones because "patient must contact provider first."  (**Joint Exhibit 21, pgs 4-5.**)

25      19.     Prior to seeing Dr. Jones on August 8, 2016, Shams filled out a Patient Health

26 Questionnaire.  On that form, which is initialed by Dr. Jones, Shams's also reported, for the first

27 time ever, that she was "bothered," by "trouble falling or staying asleep, or sleeping too much."

28 (**Joint Exhibit 24.**)

20.     On August 8, 2016, Shams returned to see Dr. Jones at La Maestra.  The history reflects that Dr. Jones inquired about acne and reflux.  The record is silent as to any questions about headache or Shams's prior requests for prescription ibuprofen refills, which had been denied by Dr. Jones. During that visit, Shams complained of "trouble falling or staying asleep, or sleeping too much."   Dr. Jones once again prescribed ibuprofen 600 mg for "headache."  However, Dr. Jones also prescribed another medication for headache, acetaminophen 500 mg.  The description clearly states that the acetaminophen was for "headache."  There was no referral to a neurologist, headache specialist or for imaging of Shams's brain."  In fact, the record does not indicate any discussion about Shams's headache history or sleep disturbance. (**Joint Exhibit 23.**)

21.     At trial, Dr. Jones admitted on the stand that she did not ask about headaches during this visit.  She did not ask if Shams's headache frequency changed; if the severity of the headaches increased; or any other questions about her headaches. (**Trial Testimony, Dr. Jones, 108:3-10.**)

22.     At trial, Dr. Jones admitted on the stand that she did not ask any questions about Shams's sleep difficulties, as related on Exhibits 23 and 24.  She also testified that waking from sleep with a headache is a "red flag," and requires imaging.  However, Dr. Jones did not ask if Shams's headaches were waking her up at night. (**Trial Testimony, Dr. Jones, 107:9-16.**)

23.     Dr. Dern, Dr. Jones's expert, testified at trial that the failure to ask about Shams's headaches and sleep problems on August 8, 2016, was a violation of the standard of care. (**Trial Testimony, Dr. Dern, 637:6-639:8, 641:3-8, 643:13-17, 646:12-648:16.**)  Dr. Contini also agreed that it was a violation of the standard of care.  (**Trial Testimony, Dr. Contini, 312:1-315:11, 315:18-317:24**)

24.     Shams saw Dr. Jones for the final time on August 31, 2016.  At that visit, based upon the medical record, there does not appear to be any inquiry about headache.  Dr. Jones's assessment included "migraine," yet she entered a new ICD code "G43.009."  Dr. Jones noted that Shams's headaches were well controlled, but also wrote "ibuprofen as needed."  Dr. Jones also entered into the note "IF worsening/more severe headaches or more than 2x/week headaches or new concerns return to clinic."  The typos are accurate as to the note.  This instruction does not appear in the discharge instruction / patient plan given to the family. Finally, the note indicates that Shams

PLAINTIFF'S STATEMENT OF FACTS AND CONCLUSIONS OF LAW

1  was maintained on acetaminophen 500mg and ibuprofen 600mg for "headache." (**Joint Exhibits 26**
2  **and 55.**)

3      25.    At trial, Dr. Jones was asked whether this new ICD code indicated that Shams's
4  headaches were made worse or exacerbated by exercise or activity, per the new ICD code. Dr.
5  Jones testified that if headaches are aggravated by physical activity, the suspicion for increased
6  intracranial pressure is raised. Dr. Jones agreed that if there is a concern for increased intracranial
7  pressure, imaging or a referral is indicated. (**Trial Testimony, Dr. Jones, 148:17-150:7.**) (**Joint**
8  **Exhibit 71 states that imaging is indicated.**)

9      26.    Dr. Jones also testified at trial that as of this visit she was aware that one of the signs
10  of an intracranial aneurysms is a pulsatile headache. (**Trial Testimony, Dr. Jones, 193:7-12.**)

11      27.    A discharge summary titled "Patient Plan for 8/31/2016," also appears in the records
12  from La Maestra. This note does not include any warning about Shams's headaches, such as that
13  found in Joint Exhibit 26. In fact, under number "5" which dealt with migraine, there are no
14  comments about whether her headaches were controlled, no instructions, and no warnings. This
15  chart entry is inconsistent with Joint Exhibit 26, despite this being an electronic health record, and
16  circumstantially indicates Dr. Jones added the warning about headaches after Shams's aneurysm
17  ruptured. (**Joint Exhibit 55, p. 2**)

18      28.    On September 7, 2016, La Maestra received a voicemail from Shams "stating West
19  Coast Eye Care informed her that she needs referral prior to being seen." This was "tasked to Dr.
20  Jones." (**Joint Exhibit 28.**)

21      29.    Dr. Jones issued a referral to West Coast Eye Care on September 7, 2016. (**Joint**
22  **Exhibit 66.**)

23      30.    The audit trail from La Maestra reflects that Dr. Jones accessed Shams's medical
24  records on September 7, 2016, at 9:31 AM, relative to the referral to West Coast Eye Care. (**Joint**
25  **Exhibit 64.**)

26      31.    On September 17, 2016, Shams suffered a rupture of her intracranial aneurysm, with
27  catastrophic brain damage. (**Joint Exhibit 35.**)

28      32.    On September 18, 2016, Dr. Michael Levy, a pediatric neurosurgeon, performed life

1   saving surgery on Shams.  He noted a ruptured giant left internal carotid artery terminus aneurysm,

2   and performed multiple surgical procedures to save Shams.  However, her brain damage was

3   catastrophic as a result of the ruptured aneurysm. (**Joint Exhibit 36**.)

4         33.    On September 22, 2016, at 10:29 AM, Dr. Jones entered into the electronic health

5   record at La Maestra that she "asked Arabic speaking MA to call family since patient hospitalized in

6   ICU s/p [status post] aneurysm rupture." (**Joint Exhibit 56**.)

7         34.    On Friday, September 23, 2016, at or about 12:11 PM, medical records from Rady

8   Children's Hospital were faxed to La Maestra, to the attention of Dr. Jones.  The record indicated

9   that Shams had presented with "1.5 years of intermittent headaches and 4 days of severe headache

10   followed by status epilepticus associated with fall in the shower." (**Joint Exhibit 58**.)

11         35.    The audit trail from La Maestra also indicates that Dr. Jones accessed Shams Al

12   Sabahi's medical records eight times from September 21 to September 26, 2016.   Specifically, she

13   accessed Shams chart three times on Thursday, September 21, 2016, four times on Friday,

14   September 22, 2016, and once on Monday, September 26, 2016, after she received the faxed records

15   from Rady Children's Hospital the prior Friday.  These intrusions into Shams chart were all while

16   Shams was in the ICU.  Reference to Joint Exhibits 26 and 55 provides circumstantial evidence that

17   Dr. Jones altered the chart and entered the information following "migraine," on Joint Exhibit 55,

18   including the warning about headaches after Shams aneurysm ruptured. (**Joint Exhibit 57**.)

19   **III.**    **CONCLUSIONS OF LAW: MEDICAL MALPRACTICE**

20   **A.**    **The Elements of Medical Malpractice:  Expert Testimony Required**

21                    **CACI 500  Medical Negligence**

22         36.    "The elements of a cause of action for medical malpractice are:

23   (1) a duty to use such skill, prudence, and diligence as other members of the profession

24   commonly possess and exercise;

25   (2) a breach of the duty;

26   (3) a proximate causal connection between the negligent conduct and the injury; and

27   (4) resulting loss or damage."

28   (Lattimore v. Dickey (2015) 239 Cal.App.4th 959, 968 [191 Cal.Rptr.3d 766].)

1

## CACI 501 Standard of Care

2   37.   Setareh Jones, M.D. is negligent if she fails to use the level of skill, knowledge, and

3   care in diagnosis and treatment that other reasonably careful physicians would use in the same or

4   similar circumstances. This level of skill, knowledge, and care is sometimes referred to as "the

5   standard of care."

6   38.   You must determine the level of skill, knowledge, and care that other reasonably

7   careful pediatricians would use in the same or similar circumstances, based only on the testimony of

8   the expert witnesses, including Dr. Jones, who have testified in this case.

9

## CACI 503 Standard of Care for Medical Specialist

10   39.   A pediatrician is negligent if she fails to use the level of skill, knowledge, and care in

11   diagnosis and treatment that other reasonably careful pediatrician would use in similar

12   circumstances. This level of skill, knowledge, and care is sometimes referred to as "the standard of

13   care."

14   40.   You must determine the level of skill, knowledge, and care that other reasonably

15   careful pediatrician would use in similar circumstances based only on the testimony of the expert

16   witnesses including, Dr. Jones, who have testified in this case.

17   41.   "In those cases where a medical specialist is alleged to have acted negligently, the

18   'specialist must possess and use the learning, care and skill normally possessed and exercised by

19   practitioners of that specialty under the same or similar circumstances.'" (Lattimore v. Dickey

20   (2015) 239 Cal.App.4th 959, 968 [191 Cal.Rptr.3d 766].)

21   42.   "The difference between the duty owed by a specialist and that owed by a general

22   practitioner lies not in the degree of care required but in the amount of skill required." (Valentine v.

23   Kaiser Foundation Hospitals (1961) 194 Cal.App.2d 282, 294 [15 Cal.Rptr. 26] (disapproved on

24   other grounds by Siverson v. Weber (1962) 57 Cal.2d 834, 839 [22 Cal.Rptr. 337, 372 P.2d 97]).)

25   i.   **Testimony of the Experts Demonstrates that Dr Jones Violated the Standard of**

26   **Care By Failing to Refer Shams to a Specialist and for Imaging of Her Brain**

27   **DR. PETER CONTINI  (PEDIATRICS)**

28   43.   Dr. Peter Contini, plaintiff's pediatrics expert, obtained his medical degree from

8

1  Georgetown University.  He completed his residency in pediatrics at Children's Memorial Hospital

2  in Chicago.  Thereafter, he completed fellowship training in pediatrics the University of California,

3  San Francisco. He is board certified in pediatrics, a past Chairman of the Department of Pediatrics at

4  Good Samaritan Hospital, and is in the private practice of general pediatrics in San Jose, California.

5        44.     Dr. Contini, testified at multiple points that Dr. Jones violated the standard of care.

6  As a threshold matter, Dr. Contini testified that the overall goal for pediatricians is to protect the

7  welfare of the child and act in her best interest.  **(Trial Testimony, Dr. Contini, 284:13-16.)**  From

8  the outset, Dr. Contini was critical of Dr. Jones's failure to obtain Shams's medical records from

9  African Alliance Health Clinic, as it is required practice and would have provided Dr. Jones with

10  information about Shams's headaches, including the daily prophylactic medication she was taking.

11  **(Trial Testimony, Dr. Contini, 286:8-12, 296:1-8.)**

12        45.     Dr. Contini testified that Dr. Jones violated the standard of care on March 30, 2015,

13  when she failed to refer Shams to a headache specialist / neurologist and for imaging of her brain.

14  Dr. Contini explained that at that point Shams had failed sumatriptan, failed ibuprofen (even at

15  1,200 mg), failed topiramate, and continued to have headaches, indicating chronic progressive

16  headaches.  The standard of care at that point required Dr. Jones order a referral to a specialist and

17  for imaging. **(Trial Testimony, Dr. Contini, 294:17-24, 300:2-5, 304:5-22.)**  Dr. Contini also

18  opined there was no risk to refer Shams to a specialist, and the benefit would have been a more

19  thorough evaluation by a specialist and identification of the problem causing her headaches. **(Trial

20  Testimony, Dr. Contini, 298:11-23.)**  Dr. Contini also opined that because Shams had chronic

21  progressive headaches of more than six months, the standard of care required neuroimaging. **(Trial

22  Testimony, Dr. Contini, 305:2-13.)**  Dr. Contini explained that chronic headaches are those with a

23  history of six months, with Shams having a history of a year by the time she saw Dr. Jones on

24  March 30, 2015. **(Trial Testimony, Dr. Contini, 304:7-305:8.)**

25        46.     Next, Dr. Contini opined that Dr. Jones violated the standard of care on June 22,

26  2015. He explained that at that visit, Shams was diagnosed with gastritis, but Dr. Jones failed to ask

27  about ibuprofen use or about her headaches.  He testified that the standard of care required inquiry

28  about ibuprofen use, and headache history.  **(Trial Testimony, Dr. Contini, 308:6-309:4.)**  (Dr.

1   Dern testified that the gastritis may have been caused by Shams taking too much ibuprofen. Dr.

2   Dern also testified she would have liked to know the information about ibuprofen use and headache.

3   **(Trial Testimony, Dr. Dern, 612:21-23, 633:3-9.))**

4   47.    Dr. Contini also testified that Dr. Jones violated the standard of care on August 8,

5   2016, after Shams made multiple requests for medication, and failed to inquire about her headaches.

6   He explained that it did not appear that headaches were even addressed at that visit, which was a

7   violation of the standard of care. He opined that Dr. Jones should have asked, and the risk of not

8   asking was missing a symptom or a sign or something more problematic. **(Trial Testimony, Dr.**

9   **Contini, 312:1-315:11.)**    At the same visit, Dr. Contini explained that Dr. Jones violated the

10  standard of care in her failure to ask about Shams's sleep disturbance. Dr. Contini opined that Dr.

11  Jones was required to ask about change in sleep pattern, whether the change was noticeable to her,

12  and whether the sleep disturbance was bothering her. **(Trial Testimony, Dr. Contini, 315:18-**

13  **317:24)** Finally, Dr. Contini opined that at this visit the standard of care required imaging because

14  the patient had chronic progressive headaches for 19 months. **(Trial Testimony, Dr. Contini,**

15  **319:13-20.)**

16  48.    Shams was seen for the last time on August 31, 2016. Dr. Contini testified that at

17  that visit, the standard of care required that she be referred to a specialist and for imaging because

18  there was indication her headaches were made worse due to physical activity. **(Trial Testimony,**

19  **Dr. Contini, 323:21-324:7.)** He explained that this is a sign of increased pressure in the brain and

20  is concerning. **(Id.)** It is important to point out that Dr. Contini's opinions were not challenged, and

21  he was not cross examined by the attorneys for the government.

22  ### DR. MICHELLE DERN (PEDIATRICS)

23  49.    Dr. Dern is a pediatrician, retained by the Government to opine on the care provided

24  by Dr. Jones. Importantly to this case, Dr. Dern agreed on cross examination that Dr. Jones violated

25  the standard of care in multiple ways, but primarily not giving Shams and her mother the option

26  of imaging or seeing a specialist.

27  50.    Dr. Dern testified that on March 30, 2015, after Shams failed sumatriptan, Dr. Jones

28  had the option to refer her to a headache specialist / neurologist. Dr. Dern also testified that if Dr.

1   Jones had given that option to the family or actually referred shams, she would not have been

2   critical of Dr. Jones.  Specifically, Dr. Dern testified she would not have been critical of such a

3   referral because Shams had failed sumatriptan. This decision was up to Shams and her mother, but

4   the option was not given. **(Trial Testimony, Dr. Dern, 615:13-616:4, 616:21-617:11, 624:3-7.)**

5       51.     Dr. Dern also testified that when the patient came back to La Maestra on August 8,

6   2016, it was after Shams's July 29th and August 1st requests for ibuprofen were denied.  Despite this,

7   Dr. Dern conceded that Dr. Jones did not ask any questions about the requests for headache

8   medication (ibuprofen), or any questions about Shams headaches. **(Trial Testimony, Dr. Dern,**

9   **637:6-639:8)**    In fact, Dr. Dern testified as follows and specifically stated that Dr. Jones violated

10  the standard of care.

> Q: Doctor, did the standard of care require Dr. Jones to inquire why shams needed
> ibuprofen on August 1st?
> A: (Pause)
> Q: It's okay to say yes.
> A: Yeah.  As she was refilling the medication that she had originally prescribed for her for
> that problem, yes.
> **(Trial Testimony, Dr. Dern, 641:3-8)**

16      52.     Continuing on the subject of the August 8, 2016, office visit at La Maestra, Dr. Dern

17  also testified that it was a violation of the standard of care when Dr. Jones failed to ask one question

18  about Shams's headaches. **(Trial Testimony, Dr. Dern, 643:13-17.)**  During this visit, Shams had

19  complaints about difficulty with sleep.  Dr. Dern agreed that the standard of care required a referral

20  for imaging if Dr. Jones had information about Shams awakening from sleep with a headache.

21  **(Trial Testimony, Dr. Dern, 646:12-648:16). (See also, Joint Exhibit 71**, which sets forth the

22  same requirement for imaging when sleep disturbance is present.)  Dr. Dern agreed there was no

23  risk in Dr. Jones asking about sleep problems. Dr. Dern conceded that Dr. Jones simply did not ask

24  any questions about sleep difficulty. **(Id.)** Finally, Dr. Dern agreed that had Dr. Jones asked about

25  sleep, she might "find out more about what's going on with her headaches," and it might point "in

26  the direction to refer her to a specialist," or be sent for imaging. **(Id. at 649:14-23.)**  These options

27  were never given to Shams because Dr. Jones did not ask about sleep. **(Id. at 650:9-11.)**

28      53.     When asked about literature from the American Academy of Pediatrics, Dr. Dern

1  agreed that AAP guidelines states that MRI is indicated for patients with consistent migraine or
2  chronic type headaches.  However, Dr. Jones did not give the family or Shams this option for such
3  imaging on August 8, 2016. **(Trial Testimony, Dr. Dern, 657:25-658:12.)**

4      54.    When asked about similar recommendations in the Journal of Neurological
5  Disorders, Dr. Dern agreed that it recommended imaging for patients with chronic headaches. **(Id.**
6  **at 679:1-14.)**

7      55.    Dr. Dern agreed that if any physical activity caused increased headache or head pain,
8  the standard of care required that Shams be given the option to see a specialist. **(Trial Testimony,**
9  **Dr. Dern, 587:2-11.) (See also, Joint Exhibit 71** – Which sets forth the same standard.)

10                        **DR. IRA LOTT (NEUROLOGY)**

11      56.    Dr. Ira Lott, is a pediatric neurologist, called by the plaintiff. Dr. Lott obtained his
12  medical degree from Ohio State University.  He completed internship and residency training at
13  Massachusetts General Hospital / Harvard University, in both pediatrics and neurology.  After
14  serving in the Public Health Service during the Vietnam War, focusing on pediatric neurology, he
15  returned to Harvard University to further his training in child neurology.  He has been affiliated with
16  the University of California Irvine for most of his career and has been a professor and Chairman of
17  the Department of Pediatrics.  He has also done research work with the National Institutes of
18  Health, a Board Member of the American Academy of Pediatrics, and has lectured all over the
19  world.  He has published more than 146 articles in peer reviewed medical journals.  He is board
20  certified in both pediatrics and neurology, with a certification in child neurology.

21      57.    Dr. Lott has significant experience and expertise in the evaluation and treatment of
22  pediatric patients with headache, just like Shams.  Dr. Lott opined that Shams had refractory
23  headaches, meaning the medications prescribed to her did not alleviate her pain. He testified at trial
24  that given the failure of topiramate, sumatriptan, and ibuprofen, Shams migraines were considered
25  atypical.  As such, the standard of care required either a referral to a neurologist or for a
26  neuroimaging procedure. **(Trial Testimony, Dr. Lott, 503:1-8, 504:19-505:15.)**  Specifically, Dr.
27  Lott testified that given Shams complaints, and based upon the medical records, the standard of care
28  required imaging in the form of a CT scan or an MRI. **(Id. at 506:8-16.)**  Finally, Dr. Lott opined

1   that because Shams's headaches were atypical, and on one side of her head, this was a red flag there

2   might be an intracranial lesion, which required imaging. **(Id. at 507:5-20.)**

3                          **DR. STEVEN GIANNOTTA (NEUROSURGERY)**

4          58.    Dr. Steven Giannotta was plaintiff's neurosurgical expert.  Dr. Giannotta is the

5   Chairman of the Department of Neurosurgery at the University of Southern California, and

6   affiliated hospitals.  Dr. Giannotta obtained his medical degree from the University of Michigan,

7   and completed his training at there as well.  He is Board Certified in neurological surgery.  Dr.

8   Giannotta is responsible for the neurological surgery residency training program at USC and Keck

9   Hospital.  He is often called to Children's Hospital Los Angeles to perform pediatric neurosurgery.

10  He is a past president of the American Academy of Neurological Surgery, which publishes the

11  Journal of Neurological Surgery.  He has also been the Chairman of the American Board of

12  Neurological Surgery, which certifies all American neurosurgeons.  Dr. Giannotta has published

13  hundreds of articles in peer reviewed journal and chapters in medical textbooks. Dr. Giannotta

14  trained both Dr. Alexander Khalessi, the governments neurosurgical experts, and Dr. Michael Levy,

15  who performed the surgery on Shams at Rady's Children's Hospital.

16         59.    Dr. Giannotta has treated over 3,000 aneurysms during his career.  Dr. Giannotta

17  opined that the standard of care required Shams be referred for further neurological and

18  neuroradiological workup.  He explained given Shams's repeated complaints of headache, when she

19  was otherwise a healthy adolescent, she should have been sent for imaging and to a neurologist for

20  further examination and evaluation. **(Trial Testimony, Dr. Giannotta, 414:25-415:7.)**

21                   **DR ALEXANDER KHALESSI AND DR. JAMES NELSON**

22         60.    The Government's neurosurgical expert, Dr. Khalessi, and neurology expert, Dr.

23  Nelson, did not offer any standard of care opinions.  Nor did either expert refute the standard of care

24  testimony given by Dr. Contini, Dr. Lott, or Dr. Giannotta.

25  **B.    Causation: Dr. Jones's Negligence Caused Permanent Brain Damage**

26                        **CACI 430 Causation: Substantial Factor**

27         61.    A substantial factor in causing harm is a factor that a reasonable person would

28  consider to have contributed to the harm. It must be more than a remote or trivial factor. It does not

1    have to be the only cause of the harm.  Conduct is not a substantial factor in causing harm if the

2    same harm would have occurred without that conduct.

3        62.     "[E]vidence of causation 'must rise to the level of a reasonable probability based

4    upon competent testimony. [Citations.] "A possible cause only becomes 'probable' when, in the

5    absence of other reasonable causal explanations, it becomes more likely than not that the injury was

6    a result of its action."[Citation.] The defendant's conduct is not the cause in fact of harm " 'where

7    the evidence indicates that there is less than a probability, i.e., a 50-50 possibility or a mere chance,'

8    " that the harm would have ensued.' " (Bowman v. Wyatt (2010)186 Cal.App.4th 286, 312 [111

9    Cal.Rptr.3d 787].)

10       63.     In medical malpractice, '[w]here the complexity of the causation issue is beyond

11   common experience, expert testimony is required to establish causation.'" (Webster v. Claremont

12   Yoga (2018) 26 Cal.App.5th 284, 290 [236 Cal.Rptr.3d802], internal citation omitted.)

13      i.    **Dr. Jones's Violation of the Standard of Care Led to Shams's Aneurysm**

14            **Rupturing, Causing Catastrophic Brain Damage.  Had Dr. Jones Complied**

15            **with the Standard of Care, Shams's Aneurysm Would Have Been Successfully**

16            **Treated**

17       64.     Dr. Peter Contini opined that had Dr. Jones referred Shams for imaging or to a

18   specialist, it would have provided Shams an earlier surgical intervention and would have avoided

19   this catastrophic outcome.  **(Trial Testimony, Dr. Contini, 326:1-10.)**

20       65.     Dr. Stephen Dorros, a neuroradiologist, was called on behalf of the plaintiff.  Dr.

21   Dorros testified that had Shams been sent for imaging of her brain, the aneurysm would have been

22   discovered any time in the two years before her rupture, even at a much smaller size, on either CT

23   scan or MRI.  **(Trial Testimony, Dr. Dorros, 241:10-242:1.)**

24       66.     Dr. Lott testified that aneurysms are known causes of migraine headaches in patients

25   like Shams.  He explained aneurysms, like the one Shams had, take up space in the brain, cause

26   pressure changes, which in turn causes pressure and stretching on nerves, which triggers migraines.

27   **(Trial Testimony, Dr. Lott, 503:17-504:2.)**

28       67.     The Government's causation expert was Dr. Alexander Khalessi, the head of

14

1    Neurosurgery at the University of California San Diego.  As a threshold matter, Dr. Khalessi

2    testified that at least 50 percent of aneurysms are discovered incidentally, when a patient is imaged

3    for other reasons.  **(Trial Testimony, Dr. Khalessi, 713:3-11.)**  He also testified that 8.3% of

4    patients with an aneurysm, their only symptom is headache.  Just like Shams.  **(Trial Testimony,**

5    **Dr. Khalessi, 751:2-10, 752:9-13.)**  Dr. Khalessi agreed that the rupture of Shams's aneurysm

6    caused irreversible and catastrophic brain damage. **(Trial Testimony, Dr. Khalessi, 743:17-21,**

7    **744:8-16.)**  There was no dispute at trial that the aneurysm's rupture was a catastrophic event.

8          68.    More importantly, Dr. Khalessi also testified at trial, supported by literature, that this

9    type of surgery had a 62% good outcome rate.  **(Trial Testimony, Dr. Khalessi, 729:22-730:10.)**

10   Clearly, this testimony rises to the level of reasonable probability as set forth in the law stated

11   directly above. In order to make this abundantly clear, Dr. Khalessi testified on cross examination

12   that the majority of these patients are treated safely, and even stated "the majority being more than

13   half." **(Trial Testimony, Dr. Khalessi, 745:19-22.)**  Further, on cross examination Dr. Khalessi

14   agreed that 70 percent of patients can be treated safely with good outcomes, and that had Shams

15   been treated, she would have made a "functional outcome," and would be "independent," today, at

16   her "previous level of functional status."    Dr. Khalessi agreed that his causation opinion was to a

17   reasonable degree of medical probability. **(Trial Testimony, Dr. Khalessi, 746:2-18.)**

18         69.    Plaintiff's neurosurgical expert, Dr. Giannotta, who trained Dr. Khalessi, agreed that

19   had Shams been referred to a specialist or for imaging, her aneurysm would have been diagnosed

20   and she would have been evaluated for surgical treatment of her intracranial pathology.  He

21   explained that earlier diagnosis would have allowed time for thought, time for education of the

22   family, consideration of alternatives, and to operate in an environment where the brain was not

23   swollen and already had a compromised blood supply, or with out-of-control intracranial pressure.

24   **(Trial Testimony, Dr. Giannotta, 415:8-417:13.)**  He also explained, that had the aneurysm not

25   ruptured and the brain not sustained damage from that rupture, the surgeon would have been able to

26   get rid of the aneurysm without causing damage to the brain. **(Id. at 420:3-421:12.)**  Finally, Dr.

27   Giannotta opined, to a reasonable degree of medical probability, that 70 percent of patients like

28   Shams do well, and surgery would have changed Shams's future and course. **(Id., at 423:11-16,**

435:17-436:4.)

**C.**    **Any Comparative Fault on the Part of Shams's Parents Can Not Be Attributed to Shams**

70.    During trial, there were several questions asked of Mr. Al Sabahi and Ms. Aloos about their conduct prior to Shams's aneurysm rupturing. Given those questions, it is anticipated that the Government may argue that Shams's parents' comparative fault should be attributed to Shams as a means of reducing any potential recovery. However as is set forth in Lawrence v. La Jolla Beach and Tennis Club, 231 Cal.App.4th 11, a parent's negligence is not imputable to a child in an action by the child for injuries. (Id. at 30.) Here, because Shams was a child at the time her aneurysm ruptured, any argument that her parents were negligent, must not be imputed to Shams.

**D.**    **Damages: It is Beyond Dispute That Shams Suffered Damage**

71.    There is no debate that Shams has suffered irreversible and catastrophic brain damage. As such, she will be reliant on others for all of her daily care needs for the remainder of her life. The Government's neurology expert, Dr. Nelson, agreed that Shams is neurologically devastated and requires future care. (**Trial Testimony, Dr. Nelson, 779:9-12.**)

72.    As a result of her injury, Shams will be dependent on others for all of her daily care needs. She will never be independent, will never earn an income, will never marry, never have children, among many other life events. In California, Shams's general damages are limited to $250,000.00 for her future pain and suffering pursuant to MICRA and California Civil Code section 3333.2. However, Sham's economic damages are not limited.

///

///

///

///

///

///

///

///

16

73.     Plaintiff's economic analysis, which was based upon the Life Care Plan prepared by plaintiff's expert life care planner, sets forth the damages suffered by Shams. **(See Joint Exhibit 75.)** That report, indicates the following values of damages, with the assumption made that Sham's would have obtained a professional degree, based upon the testimony of the family that she wanted to be a lawyer, and her excellent grades **(See Joint Exhibit 51.)** Additionally, the State of California has placed a lien on Shams's case, which must be repaid to the State should Shams receive a verdict and award. **(See Joint Exhibit 68.)**

| | |
|---|---|
| Past and Future Earnings Loss | $2,820,626.00 |
| Future Medical Care | $11,983,781.00 |
| General Damages | $250,000.00 |
| Medi Cal Lien | $1,261,564.26 |

| | |
|---|---|
| **TOTAL DAMAGES** | **$16,315,971.30** |

## IV.     CONCLUSION

74.     The facts and law cited above, when analyzed with the weight of expert testimony, indicates that Dr. Jones violated the standard of care in her care and treatment of Shams Al Sabahi. Clearly, Dr. Jones had a duty to provide competent medical treatment to Shams, compliant with the standard of care. Dr. Jones had multiple opportunities to refer Shams to a specialist and/or for imaging of her brain because of her atypical refractory migraine headaches, but failed to do so, which according to Dr. Contini, Dr. Lott, Dr. Dern, and Dr. Giannotta was a violation of the standard of care. This breach of the standard of care lead to a rupture of Shams's aneurysm, with catastrophic consequences.   What is abundantly clear, according to both neurosurgeons, Dr. Khalessi and Dr. Giannotta, had Shams been referred to a specialist or for imaging, her aneurysm would have been identified, successfully treated before rupture, such that Shams would be a healthy and independent woman today, well on her way to law school and a career in the FBI.  In fact, Dr. Khalessi and Dr. Giannotta both agreed, to a reasonable degree of medical probability, that would have allowed Shams to return to her pre-surgical baseline, i.e., completely normal. Finally, as is set forth above, Shams suffered catastrophic brain damage, and will never be independent, never work,

17

1   and will remain reliant on others for all of her daily care needs for the remainder of her life, making

2   her damages extensive.  The Court had the opportunity to meet and see Shams in the courtroom, it

3   also had the benefit of seeing pictures of Shams prior to her injury.  There is not debate that Shams

4   is profoundly injured.  (**Please see Joint Exhibits 72 and 73.**)

5          As such, plaintiff respectfully submits that this Court should find in her favor and award her

6   $16,315,971.30 in damages.

7

8   DATED: February 17, 2023          LAW OFFICES OF MARSHALL SILBERBERG

9

10                                    By

11                                        MARSHALL SILBERBERG, ESQ.
                                          WILLIAM S. COLLLINS, ESQ.
12                                        Attorneys for Plaintiffs,
                                          S.A., a minor, BY AND THROUGH
13                                        HER GUARDIAN AD LITEM EHSAN AL
                                          SABAHI
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S STATEMENT OF FACTS AND CONCLUSIONS OF LAW

**PROOF OF SERVICE**
(C.C.P. §1013(a) and §2015.5)

STATE OF CALIFORNIA, COUNTY OF ORANGE

I, Guadalupe Gastelum, am employed in the County of Orange, State of California. I am over the age of eighteen years and not a party to the within action. I am employed with the Law Offices of Marshall Silberberg.

On, February 21, 2023, I served the within: **PLAINTIFF'S POST TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW** on all interested parties in this action by placing a true copy thereof, enclosed in a sealed envelope addressed as follows:

**SEE ATTACHED SERVICE LIST**

[ ]    **MAIL** - I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Newport Beach, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing an affidavit.

[ ]    **BY PERSONAL SERVICE** - Such envelope(s) were delivered by hand to the office(s) of the addressee(s).

[X]    **By CM/ECF NOTICE OF ELECTRONIC FILING** - I caused said document(s) to be served by means of this Court's electronic transmission of the Notice of Electronic filing through the Court's transmission facilities, to the parties and/or counsel who are registered CM/ECF Users set forth in the service list obtained from this Court:

[ X ]    **BY EMAIL** – I caused a true copy of the foregoing document(s) to be served by electronic email transmission at the time shown on each transmission, to each interested party at the email address shown above. Each transmission was reported as complete and without error.

[ ]    STATE - I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

[ X ]    FEDERAL - I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on February 21, 2022, at Irvine, California.

*Guadalupe Gastelum*
Guadalupe Gastelum

1
PROOF OF SERVICE

1

SERVICE LIST

2

3     **_Attorneys for Defendants, UNITED STATES OF AMERICA; LA MAESTRA_**

4     **_COMMUNITY HEALTH CENTERS; and SETAREH JONES, MD_**

5
      ADAM L. BRAVERMAN
6     United States Attorney
      STEVE B. CHU
7     Assistant U.S. Attorney
      California Bar No. 221177
8     Office of the U.S. Attorney
      880 Front Street, Room 6293
9     San Diego, CA 92101
      Tel: (619) 546-7167
10    Fax: (619) 546-7754
11    Email: steve.chu@usdoj.gov
      steve.poliakoff@usdoj.gov
12    Larry.Chaney@usdoj.gov
13    Sandra.Huston@usdoj.gov

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2