**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

S.A., a minor, BY AND THROUGH
HER GUARDIAN AD LITEM EHSAN
AL SABAHI,

                      Plaintiff,

v.

UNITED STATES OF AMERICA; LA
MAESTRA COMMUNITY HEALTH
CENTERS; SETAREH JONES, MD; and
DOES 1 through 30, inclusive,

                    Defendants.

Case No.:  3:18-cv-00061-RBM-WVG

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

      Plaintiff S.A. ("Plaintiff"), by and through her father and guardian Ehsan Al Sabahi, brings this action pursuant to the Federal Tort Claims Act ("FTCA") to recover damages for injuries she allegedly suffered as a result of medical treatment she received from La Maestra Community Health Center ("LMCHC"), including care administered by Dr. Setareh Jones, M.D. ("Dr. Jones").  Plaintiff alleges Dr. Jones failed to use the level of skill, knowledge, and care a reasonably prudent doctor would have used in the treatment of a patient who presented with Plaintiff's history and complaints, which resulted in Plaintiff suffering a ruptured aneurysm leading to permanent disability.  Defendant United

States of America ("Defendant" or "United States") alleges LMCHC and Dr. Jones met the applicable standard of care regarding the treatment of Plaintiff, and no act or omission of Defendant proximately caused Plaintiff's alleged damages.

Plaintiff brings a claim for medical negligence pursuant to the FTCA, 28 U.S.C. §§ 1346(b)(1), 2674. The parties do not dispute LMCHC is a federally funded community health center, and Dr. Jones, at all relevant times, was an employee of the United States and providing care to Plaintiff within the course and scope of her employment with the United States. Accordingly, the United States is the proper defendant in this action. A four-day bench trial was held beginning on February 6, 2023. (*See* Doc. 86.)

Having carefully reviewed the parties' evidence and arguments, as presented at trial and in their written submissions, the Court makes the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## I.  FINDINGS OF FACT

Plaintiff was born on February 8, 2000, the eldest of three children. At all relevant times, Plaintiff lived at home with her parents and her two siblings. Plaintiff's family moved to the United States from Iraq in 2009. Plaintiff and her siblings speak English and Arabic. Plaintiff's mother, Ms. Aloos—who accompanied Plaintiff to each of the medical appointments detailed below—speaks, reads, and writes in both English and Arabic, although Ms. Aloos is not fluent in English.

## Care at African Alliance

Prior to presenting at LMCHC and receiving treatment from Dr. Jones, Plaintiff presented at African Alliance Health Clinic ("African Alliance") on April 15, 2014, September 22, 2014, and November 11, 2014. Plaintiff's mother, Ms. Aloos, accompanied Plaintiff to each of Plaintiff's three visits to African Alliance. The September 22 African Alliance medical record states Plaintiff "complain[ed] of headache around temporal region once of [sic] twice a month that is reviewed [sic] with OTC Aleve." Plaintiff was prescribed a quantity of 60 ibuprofen 600 milligram ("mg") oral tablets and was instructed to take one tablet with food for pain.

3:18-cv-00061-RBM-WVG

Plaintiff returned to African Alliance on November 11, 2014 and complained of "intermittent unilateral headaches, described as throbbing." Plaintiff denied experiencing nausea or photophobia. The medical record states Plaintiff was taking ibuprofen one to two times a day when her headache occurred, "but continues to have the headache [a] couple times a week." Plaintiff denied experiencing blurry vision, motor weakness, or slurred speech, and her neurological examination at the November 11 visit was recorded as normal. Plaintiff was proscribed Topiramate, a prophylactic medication used to prevent the occurrence of headache or migraine.

## February 11, 2015 Visit to LMCHC

On February 11, 2015, Plaintiff presented for the first time at LMCHC for a well child examination. A well child examination is a yearly checkup visit conducted to review the child's overall health, consider health maintenance and preventative measures, and conduct screenings. At a well child examination, a doctor will ask the child questions about sleep, diet, exercise, school, and risk factors for future health issues. Plaintiff saw Dr. Jones during this first visit and at each of her subsequent visits to LMCHC. Plaintiff's medical records indicate her preferred language at each visit to LMCHC was English. Ms. Aloos testified at trial she and her daughter were offered an Arabic interpreter but refused, and instead spoke to Dr. Jones in English. (Doc. 95, Aloos Tr. 458:21–459:6.)

Records from Plaintiff's February 11 visit indicate Plaintiff reported receiving prior care at African Alliance. Plaintiff noted her migraines had been "diagnosed over past year" and had "occurred almost every day, now occurring 1-4 times a month." Plaintiff reported she had "been taking ibuprofen 600 mg but wants to know if any other medication is available" because "tylenol has not worked in the past." Her headache was "right sided throbbing," with "sensitivity to light and sound." Plaintiff reported having no family history of migraine and no problems sleeping. Dr. Jones performed a full neurological examination on Plaintiff, testing her cranial nerves, sensation, motor strength, sensations, balance, gait, and reflexes. Plaintiff's neurological examination was normal. She weighed 129 pounds at her February 11 visit.

3:18-cv-00061-RBM-WVG

Dr. Jones diagnosed Plaintiff with chronic migraine and prescribed Sumatriptan, a migraine abortive designed to be taken after a migraine occurs. Dr. Jones noted Plaintiff was previously on a daily preventative prophylactic medication of "unknown name," which Plaintiff "may need again." Dr. Jones noted Plaintiff was "hesitant to take daily medication" and was not taking a prophylactic medicine as of the February 11 visit. Plaintiff was instructed to keep a headache diary and practice headache hygiene—such as eating regular meals and removing caffeine from her diet—and return to LMCHC in one month for a reassessment.

Dr. Jones testified she did not have Plaintiff's records from African Alliance available at the time of Plaintiff's February 11 visit. LMCHC's general policy is to request new patients bring their prior medical records with them to their first visit. When Plaintiff first presented at LMCHC, she brought immunization records with her. Dr. Jones testified LMCHC must have a signed release from patients before the clinic can obtain medical records from other providers, but she does not know if the release was signed or followed up on, as the medical records department handles records release requests. Dr. Jones testified she did not feel the African Alliance records would have affected her management of the case based on the way Plaintiff presented at her visits to LMCHC. (Doc. 94, Jones Tr. 73:10–75:9.)

In light of Plaintiff's hesitation to take a daily medication, Dr. Jones did not prescribe Topiramate. However, the same day as Plaintiff's first visit to LMCHC (February 11), Clark's Greenfield Pharmacy ("Clark's") filled prescriptions for Plaintiff, including: (1) 30 Topiramate 25 mg tablets; (2) 9 Sumatriptan 50 mg tablets; and (3) acne medications. Dr. Jones testified at trial that, based on the history Plaintiff provided at the February 11 visit, Plaintiff was no longer taking Topiramate at the time she was seen on February 11, or at any other time while Plaintiff was in Dr. Jones's care. (Doc. 94, Jones Tr. 98:25–99:6.)

**March 30, 2015 Visit to LMCHC**

Plaintiff returned to LMCHC on March 30, 2015 for a follow-up visit. With respect to her headaches, Plaintiff's medical records indicate "[t]he severity of the problem is

moderate" and "[t]he problem is improving." Plaintiff reported "[i]mproved frequency, occurs less than 1x/week." She reported the Sumatriptan prescribed by Dr. Jones at the February 11 visit "did not work" and she was instead "taking 2 ibuprofen 600 mg tablets for headache? at onset, takes about once a week." Dr. Jones testified it was her understanding Plaintiff was taking either 400 mg or 600 mg of ibuprofen at a time—not 1,200 mg of ibuprofen—and, had Plaintiff been taking 1,200 mg of ibuprofen, the chart "would say 1200 milligrams" because "that dosage is above the recommended, so that would have been addressed more in the plan and with the patient." (Doc. 90, Jones Tr. 174:6–22.) Dr. Jones testified neither Plaintiff nor Ms. Aloos ever informed Dr. Jones Plaintiff was taking 1,200 mg ibuprofen for her headaches. (*Id*. at 197:8–18.) Dr. Jones stopped prescribing Sumatriptan to Plaintiff after this visit. Dr. Jones performed a full neurological examination on March 30, which was again normal. Plaintiff weighed 130 pounds at the March 30 visit, up one pound from the month prior.

In the "Assessment/Plan" section of the March 30 medical record, Dr. Jones diagnosed Plaintiff with "migraine, unspecified, without mention of intractable migraine, without mention of status migrainosus." Dr. Jones's impression of Plaintiff's migraines was noted as "improved." Plaintiff was instructed to take "Ibuprofen 600 mg every 8 hours as needed for headache, do NOT exceed maximum dose, take with food." The record states Plaintiff should "return to clinic" for "increased frequency/worsening/new symptoms." Dr. Jones otherwise planned to follow up with Plaintiff in three months.

Plaintiff filled out a Patient Health Questionnaire-9 ("PHQ") at the March 30 visit. The PHQ-9 is a screening tool for depression and suicide symptoms in adolescents above the age of twelve, which asks the patient about certain things he or she may have experienced during the last two weeks. The PHQ-9 is not designed to diagnose sleeping difficulties or migraine symptoms. At this visit, Plaintiff indicated on the PHQ-9 she did not have trouble falling or staying asleep, nor did she have trouble sleeping too much.

**June 22, 2015 Visit to LMCHC**

Plaintiff returned to LMCHC on June 22, 2015. The record states Plaintiff "presents

for [a]bdominal pain" which began three days ago and was moderate in severity. Plaintiff reported the quality of the pain as "achy" and said the symptoms were worse with spicy foods. Her symptoms included nausea, but did not include back pain, blood in stool, change in appetite, constipation, diarrhea, fever, or vomiting. Plaintiff reported her abdominal pain had occurred "on and off for several months." Despite her abdominal pain, Plaintiff had gained two pounds since her February 11 visit, now up to 131 pounds. Plaintiff reported "no nighttime awakening with pain." While Plaintiff's record includes migraines on her ongoing problem list, Dr. Jones and Plaintiff did not discuss Plaintiff's migraines at this visit, and the record does not indicate Plaintiff raised any concerns about her migraines while visiting with Dr. Jones.

Dr. Jones's assessment following Plaintiff's visit was "Gastritis," "[m]ost likely GERD or H. pylori." Dr. Jones prescribed "Zantac twice a day as needed for symptoms," and Plaintiff was instructed to return to the clinic in two weeks for further evaluation if symptoms had not improved. Dr. Jones also "[r]eviewed signs of acute abdomen" and advised Plaintiff to go to the emergency department for worsening pain.

**April 21, 2016 Optometrist Appointment**

On April 21, 2016, Plaintiff presented for an appointment with optometrist Dr. Amaal Odish, O.D. for a routine contact lens examination. Dr. Odish has no association with LMCHC or Dr. Jones. Plaintiff had been seeing Dr. Odish for eye care since at least September 2010. The medical record from Plaintiff's April 21 optometrist appointment notes Plaintiff was not experiencing routine headaches, double vision, or blurry or uncomfortable vision. Plaintiff reported not experiencing visual floaters or light flashes.

**July 29 and August 1, 2016 Prescription Refill Requests**

On July 29 and August 1, 2016, records from Clark's indicate Plaintiff or her mother attempted to refill Plaintiff's prescriptions for 600 mg ibuprofen tablets, clindamycin acne wash, and tretinoin facial cream. Each of Plaintiff's refill requests were denied, and the Clark's records note Plaintiff should contact her provider for an appointment.

## August 4, 2016 Call to LMCHC

On August 4, 2016, Plaintiff's mother, Ms. Aloos, contacted LMCHC. A LMCHC employee named Pauline Beeson spoke with Ms. Aloos, who informed Ms. Beeson the reason for the call was "Prescription pick up." Ms. Aloos said she was "requesting for refill of facial wash." Ms. Beeson "[i]nformed that patient needs to come in for an [appointment] as last visit was on 06/2015." Ms. Beeson also informed Ms. Aloos of the option to purchase over the counter.

## August 8, 2016 Visit to LMCHC

Plaintiff returned to LMCHC on August 8, 2016 for a visit with Dr. Jones. The medical record states Plaintiff "presents for follow up of acne and follow up of reflux." The medical record indicates Dr. Jones evaluated Plaintiff's acne, noting Plaintiff was "[h]appy with control," and Plaintiff reported her abdominal pain symptoms were occurring "once a month, worse with spicy foods." Plaintiff was instructed to take Zantac "as needed only." The record does not indicate Plaintiff made a complaint of migraine or headache at the August 8 visit. Plaintiff completed another PHQ-9 at her August 8 visit, stating there were "several days" where she had trouble falling or staying asleep. Plaintiff's chart indicated the depression screening was "[n]egative" and there was "no referral needed." Plaintiff weighed 137.4 pounds at the August 8 visit, up six pounds since her last visit to LMCHC a year prior.

Plaintiff was sent home from her August 8 visit with prescriptions for acetaminophen (Tylenol), ibuprofen, acne medications, and ranitidine. Dr. Jones prescribed 500 mg acetaminophen tablets and instructed Plaintiff to "take 1 (500MG) by oral route every 6 hours as needed for pain or headache." Plaintiff was also prescribed 600 mg ibuprofen tablets and was instructed to "take 1 tablet by mouth every 6-8 hours as needed for headache with food." Dr. Jones testified "[her] instructions to [Plaintiff] were never to take Tylenol for [Plaintiff's] headache as [Plaintiff] had previously told me [Tylenol] didn't work." (Doc. 94, Jones Tr. 115:4–11.) Dr. Jones further testified that, although Plaintiff's chart noted she was instructed to take Tylenol "as need for pain or headache," those

instructions were auto populated by the electronic health record system used at LMCHC via "a dropdown [with] the general instructions for Tylenol." (*Id*.)

### August 31, 2016 Visit to LMCHC

Plaintiff returned to LMCHC three weeks later on August 31, 2016, for a well child examination with Dr. Jones. At the August 31 appointment, Ms. Aloos completed a Pediatric Health History Form, in which she stated Plaintiff did not have any sleep problems, an interpreter was not needed, and there were no other questions or concerns about Plaintiff's health.

Plaintiff reported having "[n]o concerns today." On the PHQ-9 form, Plaintiff reported no trouble falling or staying asleep, for a depression screening score of zero. Plaintiff was measured as weighing 139.8 pounds at the August 31 visit, up two pounds since her August 8 appointment. Dr. Jones conducted a full neurological examination, including testing Plaintiff's cranial nerves, sense, reflexes, balance and gait, which were all normal.

In the Assessment/Plan section of Plaintiff's chart, Dr. Jones noted an assessment of "[m]igraine without aura and without status migrainosus, not intractable." Dr. Jones's impression of Plaintiff's migraines was "well controlled" and the patient plan included a note for "Ibuprofen as needed," "[h]eadache hygiene reviewed," and "IF worsening/more severe headaches or more than 2x/week headaches or new concerns return to clinic."

### September 7, 2016 Call to LMCHC

On September 7, 2016, Ms. Aloos left a voicemail for LMCHC, noting Plaintiff needed a referral from LMCHC prior to being seen at a new optometrist, West Coast Eye Care. The voicemail was reviewed by Ms. Beeson, who tasked the call to Dr. Jones and a medical assistant. A referral communication form was subsequently sent from LMCHC to West Coast Eye Care.

### September 17, 2016 Hospitalization

Plaintiff was admitted to Sharp Grossmont Hospital ("Sharp") on September 17, 2016, seventeen days after her final visit with LMCHC. The medical records indicate

3:18-cv-00061-RBM-WVG

Plaintiff's mother "heard a thump" while Plaintiff was in the shower, so she sent Plaintiff's brother to check on her. Plaintiff "and her brother do not get along well," so when Plaintiff did not answer her brother "he assumed that she was just [ignoring] him." Ms. Aloos went to the store with Plaintiff's siblings "and came back an hour later to find [Plaintiff] still [in] the bathroom." Plaintiff's family members eventually entered the bathroom and found Plaintiff unresponsive on the floor.

After Plaintiff was rushed to the emergency room via ambulance, Plaintiff's father, Mr. Al Sabahi, reported to Sharp "that 4 days ago [Plaintiff] did have acute severe onset of headache while doing homework that resolved spontaneously" and "Plaintiff has been intermittently seen over the past year for chronic recurrent headaches."

At trial, Ms. Aloos testified Plaintiff's headaches changed in the four or five days before Plaintiff's hospitalization. This was the first time Ms. Aloos saw Plaintiff crying due to headache pain. Plaintiff was waking up in the middle of the night and hitting her head on the wall because the pain. On or around the evening of September 15, two days prior to Plaintiff's hospitalization, Plaintiff was also complaining of a burning sensation in her head. The morning of September 17, prior to Plaintiff's fall in the shower, Plaintiff told Ms. Aloos had a headache and had not slept well the night before. (Doc. 96, Aloos Tr. 479:2–480:21.)

Plaintiff was subsequently transferred to Rady Children's Hospital ("Rady"), whose records indicate Plaintiff presented "with 1.5 years of intermittent headache and 4 days of severe headache" followed by her fall in the shower. Plaintiff's records from Rady indicate she suffered a ruptured giant aneurysm on the left side of her brain. Plaintiff underwent emergency brain surgery on September 18, 2016, which was performed by Dr. Michael Levy, M.D., chief of pediatric neurosurgery at Rady. Plaintiff suffered catastrophic brain damage and was hospitalized for several months. Plaintiff continues to undergo treatment following her aneurysm and will be reliant on care for the remainder of her life.

## II.    LEGAL STANDARD

The FTCA directs the Court to apply California law, where the alleged tort occurred.

28 U.S.C. § 1346(b)(1); *Daly v. United States*, 946 F.2d 1467, 1469 (9th Cir. 1991). To establish a claim for medical negligence under California law, the plaintiff must establish: "(1) a duty to use such skill, prudence, and diligence as other members of the profession commonly possess and exercise; (2) a breach of the duty; (3) a proximate causal connection between the negligent conduct and the injury; and (4) resulting loss or damage." *Johnson v. Superior Ct.*, 49 Cal. Rptr. 3d 52, 58 (Cal. Ct. App. 2006) (citing *Hanson v. Grode*, 90 Cal. Rptr. 2d 396, 400 (Cal. Ct. App. 1999), *as modified* (Nov. 29, 1999)); *see also* Judicial Council of California Civil Jury Instructions (2022) ("CACI") Nos. 400, 500. Plaintiff has the burden of proving each of these elements by a preponderance of the evidence. *Johnson*, 49 Cal. Rptr. 3d at 57.

California courts require "only that physicians and surgeons exercise in diagnosis and treatment that reasonable degree of skill, knowledge, and care ordinarily possessed and exercised by members of the medical profession under similar circumstances." *Mann v. Cracchiolo*, 694 P.2d 1134, 1143 (Cal. 1985), *overruled on other grounds by Perry v. Bakewell Hawthorne, LLC*, 389 P.3d 1 (Cal. 2017); *see also Landeros v. Flood*, 551 P.2d 389, 392–93 (Cal. 1976). This level of skill, knowledge, and care is referred to as the "standard of care." *See* CACI No. 501. "Because the standard of care in a medical malpractice case is a matter peculiarly within the knowledge of experts, expert testimony is required to prove or disprove that the defendant performed in accordance with the standard of care unless the negligence is obvious to a layperson." *Johnson*, 49 Cal. Rptr. 3d at 58 (internal quotation marks and citations omitted); *see also Landeros*, 551 P.2d at 394.

"Mere error of judgment, in the absence of a want of reasonable care and skill in the application of his medical learning to the case presented, will not render a doctor responsible for untoward consequences in the treatment of his patient." *Huffman v. Lindquist*, 37 Cal. 2d 465, 475, 234 P.2d 34, 40 (Cal. 1951) (citations omitted). "After a medical condition has been discovered it may be relatively easy to look back and identify a diagnostic procedure which would have revealed the condition but which was not

medically indicated at the time." *Vandi v. Permanente Med. Grp., Inc.*, 9 Cal. Rptr. 2d 463, 467 (Cal. Ct. App. 1992). However,

> in treating a patient a physician can consider only what is known at the time he or she acts. At the time of treatment there may be dozens, perhaps even hundreds, of diagnostic procedures which could reveal a rare and unforeseen medical condition but which are not medically indicated.

*Id*.

To prove causation, the Plaintiff must establish "the defendant's breach of duty . . . was a substantial factor in bringing about the plaintiff's harm." *Mayes v. Bryan*, 44 Cal. Rptr. 3d 14, 25 (Cal. Ct. App. 2006), *as modified* (June 21, 2006). "Moreover, in a medical malpractice action, causation must be proven to a reasonable medical probability, rather than a reasonable medical possibility, based upon competent expert testimony." *Wright v. United States*, No. 314CV00822GPCBLM, 2017 WL 3021156, at *9 (S.D. Cal. July 17, 2017) (emphasis omitted) (citing *Jones v. Ortho Pharm. Corp.*, 163 Cal. App. 3d 396, 403 (Cal. Ct. App. 1985)). "A possible cause only becomes 'probable' when, in the absence of other reasonable causal explanations, it becomes more likely than not that the injury was a result of its action." *Miranda v. Bomel Const. Co., Inc.*, 187 Cal. App. 4th 1326, 1336 (Cal. Ct. App. 2010). Accordingly, "[c]ausation is proven when a plaintiff produces sufficient evidence to allow the jury to infer that in the absence of the defendant's negligence, there was a reasonable medical probability the plaintiff would have obtained a better result." *Mayes*, 139 Cal. App. 4th at 1093 (internal citations and quotation marks omitted).

## III. DISCUSSION

At trial and in Plaintiff's post-trial submission, Plaintiff argues Dr. Jones breached the standard of care by failing to refer Plaintiff to a neurology specialist or for brain imaging. (*See* Doc. 100 at 8.) Plaintiff also argues Dr. Jones's failure to refer Plaintiff to a specialist and for imaging caused Plaintiff's ruptured aneurysm. (*Id*. at 14.)

**A. Breach of the Standard of Care**

The Court will first consider whether Plaintiff has proven by a preponderance of the evidence Dr. Jones and LMCHC breached the standard of care. Each of Plaintiff's five visits to LMCHC are addressed in turn.

### 1. February 11, 2015 Visit

Plaintiff's expert Dr. Peter Contini, M.D., a pediatrics physician, was called to opine on whether Dr. Jones met the standard of care as it relates to her care and treatment of Plaintiff. (Doc. 91, Contini Tr. 282:21–25.) Regarding the February 11 visit, Dr. Contini testified Dr. Jones had a "responsibility" to try to obtain Plaintiff's prior medical records upon Plaintiff's presentment at LMCHC, which in "practical terms" means the pediatrician or the pediatrician's office "would provide the parent with a -- a form that they would fill out, that would then be submitted to the previous practice to obtain those records. And -- and then if those -- sometimes those records don't show up, and so we sometimes need to follow up on that." (Doc. 91, Contini Tr. 286:6–19.) With respect to African Alliance prescribing Plaintiff a prophylactic medication, Dr. Contini testified that upon hearing Plaintiff had been prescribed a prophylactic medication, he would be "very interested to know more details about the headache, and what led to that prescription in the first place," including "if she's still taking it or if it's working." (Doc. 91, Contini Tr. 289:13–290:6.)

Dr. Contini did not specifically opine Dr. Jones violated the standard of care at the February 11 visit. In any event, Dr. Jones's testimony and the testimony of Dr. Michelle Dern, M.D., Defendant's pediatric expert, show Dr. Jones complied with the standard of care. Dr. Jones testified that although she did not obtain the African Alliance records, she "did not feel that they would have affected [her] management based on the way [Plaintiff] presented at her visits." (Doc. 94, Jones Tr. 73:21–74:3.) Dr. Jones also testified LMCHC's policy is to request patients bring records with them, and that LMCHC's records department will provide a release for the patient to sign. (Doc. 94, Jones Tr. 74:20–75:4.) She testified she "asked for a release of information for additional records from African Alliance" but it was "not unusual -- especially at that time when things had to be faxed and

sent over -- to not have those records available for patients." (Doc. 90, Jones Tr. 161:23–162:6.) Regarding Plaintiff's use of a prophylactic medication, Plaintiff's medical records make clear Dr. Jones obtained a thorough history from Plaintiff, noting Plaintiff was previously prescribed a prophylactic medication. (*See* Doc. 94, Jones Tr. 83:9–15.) Dr. Jones testified Plaintiff was no longer taking the prophylactic when she presented at LMCHC on February 11 because she did not want to take a daily medication. (Doc. 94, Jones Tr. 83:19–84:11.)

Dr. Dern, who was called by Defendant to offer opinions regarding whether Dr. Jones met the standard of care in her care and treatment of Plaintiff (Doc. 96, Dern Tr. 520:9–17), testified when a new patient is first seen by a doctor, the patient's records are often not available to the provider. (Doc. 96, Dern Tr. 523:12–20.) Dr. Dern testified a patient's immunization records—which Dr. Jones had at the time of Plaintiff's first visit—"would be the most important part" of the Plaintiff's medical record at the time of the well child examination. (Doc. 96, Dern Tr. 523:21–524:1.) Dr. Dern testified "[f]or the purpose of this visit, [Dr. Jones] didn't need all of the past medical records to do the well child check." (Doc. 96, Dern Tr. 524:2–6.) Dr. Dern also opined on Plaintiff's reluctance to take a prophylactic medication, testifying that in her experience, "[i]t's hard to get adolescent patients to follow a daily medication regimen" and a reluctance to take daily medication is "a pretty common concern that would come up." (Doc. 96, Dern Tr. 535:13–25.) Dr. Dern testified Dr. Jones's treatment of Plaintiff at the February 11 complied with the standard of care. (*See* Doc. 96, Dern Tr. 522:25–523:6; 531:8–19; 536:1–5.) The Court credits Dr. Dern's testimony and concludes Dr. Jones did not breach the standard of care at the February 11 visit.

### 2. March 30, 2015 Visit

Dr. Contini testified Plaintiff's March 30 visit to LMCHC was the first opportunity Dr. Jones had to refer Plaintiff to a neurologist because Plaintiff had by then failed other treatment options, including a migraine abortive (Sumatriptan), ibuprofen, and a prophylactic (Topiramate). (Doc. 91, Contini Tr. 294:13–24.) He testified Dr. Jones failed

to meet the standard of care by not referring Plaintiff for imaging due to Plaintiff having chronic progressive headaches—i.e., headaches getting worse in either intensity or frequency, or both, over time. (Doc. 91, Contini Tr. 305:3–13.) Dr. Contini testified the standard of care also required Dr. Jones to refer Plaintiff for imaging if her headaches were chronic nonprogressive headaches—headaches which remain the same frequency and intensity over a period of about six months. (Doc. 91, Contini Tr. 306:13–18.)

Dr. Dern testified there was no indication as of March 30 to refer Plaintiff to a neurologist, to order neuroimaging, or to order additional labs because, according to the medical records, Plaintiff's headaches were becoming less frequent as of March 30 and were not occurring continuously. (Doc. 96, Dern Tr. 558:9–25; 559:17–22.) She testified Dr. Jones's prescription of ibuprofen as needed and her warning to return to the clinic if Plaintiff's symptoms changed were both within the standard of care. (Doc. 96, Dern Tr. 559:5–15.)

Plaintiff has failed to prove by a preponderance of the evidence Dr. Jones's treatment of Plaintiff at the March 30 visit fell below the standard of care. Dr. Contini's testimony is contradicted at least in part by the medical record (and Dr. Jones's testimony). Dr. Contini testified by March 30, Plaintiff had failed other treatment options, including Sumatriptan, ibuprofen, and Topiramate. The parties agree Plaintiff reported to Dr. Jones on March 30 Sumatriptan did not work. (Joint Ex. 16 at 1.)[1] The record does not suggest,

---

[1] Dr. James Nelson, M.D., a pediatric neurologist who testified on behalf of Defendant, testified the failure of Sumatriptan does not help with the diagnosis or non-diagnosis of migraine, because Sumatriptan has a high failure rate of anywhere between 40 and 60 percent. (Doc. 97, Nelson Tr. 767:1–14.) Dr. Ira Lott, M.D., a pediatric neurologist who testified on behalf of Plaintiff, similarly reported treating patients who have not responded to Sumatriptan. (Doc. 96, Lott. Tr. 502:10–19.)

Dr. Lott, in reviewing at trial the opinions offered in his expert report, testified "within [his] practice" it "was common in that a child with the features that are mentioned here would usually have a neuroimaging procedure, at least a CT scan or an MRI, if possible." (Doc. 96, Lott. Tr. 506:8–16.) Dr. Lott did not specifically testify Dr. Jones operated below

however, Plaintiff failed ibuprofen at the time of the March 30 visit. Plaintiff reported her headaches were "improving" and noted "[i]mproved frequency, occurs less than 1x/week." (*Id.*) Plaintiff did not state the ibuprofen was not working; instead, she reported to Dr. Jones she was taking ibuprofen "about once a week" for headaches at onset. (*Id.*) Dr. Jones continued to prescribe ibuprofen as needed following the March 30 visit.

The Court also does not find Dr. Contini's testimony Plaintiff had failed Topiramate supported by the record. At Plaintiff's prior visit to LMCHC on February 11, Plaintiff reported to Dr. Jones she was previously on Topiramate but was "hesitant to take daily medication." (Joint Ex. 14 at 4.) While Plaintiff offered evidence she filled her Topiramate prescription at the pharmacy on February 11, Plaintiff did not offer evidence she had been taking Topiramate daily as prescribed or that she was still taking Topiramate as of February 11. To the contrary, the medical records suggest, and Dr. Jones testified, Plaintiff reported she was not taking a prophylactic medication as of February 11 or at any time during Dr. Jones's care of Plaintiff. (*Id.*; Doc. 94, Jones Tr. 83:19–84:11.) Dr. Dern opined, in her experience as a practicing pediatrician, it is not unusual for adolescents to be reluctant to take daily medication. (Doc. 96, Dern Tr. 535:13–25.)

Dr. Contini's opinion Plaintiff was experiencing chronic progressive headaches is also belied by the medical records. Plaintiff's counsel argued at trial Plaintiff's headaches occurring "less than 1x/week" on March 30 was an increase in frequency from her February 11 visit, when Dr. Jones indicated Plaintiff's headaches were occurring "1-4 times a month." (Joint Exs. 16 at 1; 14 at 1.) The Court is not persuaded "less than 1x/week" indicates an increase in frequency from "1-4 times a month," especially because Plaintiff reported to Dr. Jones "[t]he problem [was] improving." (Joint Ex. 16 at 1.) Dr. Contini

---

the standard of care in not referring Plaintiff for imaging as of March 30. Additionally, Dr. Lott's opinions were premised in part on factual issues Plaintiff did not prove at trial, including that Plaintiff had failed Topiramate and ibuprofen was not helping to alleviate Plaintiff's headaches (despite Plaintiff reporting to Dr. Jones on March 30 that the problem was improving).

similarly appeared skeptical the frequency of Plaintiff's headaches increased between February 11 and March 30, testifying only that Dr. Jones's notes "sound like pretty similar frequency of headaches." (Doc. 91, Contini Tr. 292:22–293:4.)[2] Dr. Contini's opinion that imaging was required even if Plaintiff's headaches were chronic nonprogressive is also undercut by the records stating Plaintiff's headaches were improving.

At trial, both parties referenced various literature which discuss when an adolescent with complaints of headache should be referred to a neurologist or for imaging. Dr. Dern based her testimony and opinions upon two "headache algorithms" developed by Rady Children's Hospital in San Diego, as well as a 2012 article titled "Pediatric Headache: A Review," authored by Heidi K. Blume and published in "Pediatrics in Review," a publication of the American Academy of Pediatrics. (*See* Joint Exs. 69–71.) Dr. Dern testified the headache algorithms were "developed to help the community pediatricians with the evaluation and management of patients with headache so that pediatricians could do this without having to refer all of the patients with headache to the specialists." (Doc. 96, Dern Tr. 537:8–12.) Because up to 25 percent of adolescent women experience headaches, the algorithms were designed, consistent with the standards of pediatric organizations in the United States, to limit referrals to only those cases where necessary. (Doc. 96, Dern Tr. 537:13–538:8.)

Dr. Dern testified the Rady headache algorithm makes clear imaging is not indicated for simple migraines. (Doc. 96, Dern Tr. 538:19–23; *see also* Joint Ex. 69.) Instead, imaging is indicated only when certain signs or symptoms are present in the patient, including: (1) historical information, such as presence of a shunt, diagnosis of neurofibromatosis, or an immunosuppressed child; (2) atypical presentation, such as dizziness, double vision, vertigo, lack of coordination, or confusion; (3) abnormal neurological examination finding; (4) concern for increased intracranial pressure, including

---

[2] When pushed by Plaintiff's counsel, Dr. Contini conceded it was "possible" the frequency of Plaintiff's headaches might have increased. (Doc. 91, Contini Tr. 293:5–11.)

papilledema or awakening from sleep with headache or vomiting; and (5) chronic progressive or persistently posterior headaches. (Joint Ex. 69.) Dr. Dern testified, according to the medical record, Plaintiff did not have any of the signs or symptoms which would have necessitated a referral to neurology or for imaging. (Doc. 96, Dern Tr. 540:7–10.) Plaintiff had a typical presentation at the examination, her neurological examination was normal, and she did not report awakening from sleep with headache or vomiting. Additionally, as Dr. Dern testified and as further outlined above, the medical records do not indicate Plaintiff's headaches were chronic progressive headaches on March 30 because Plaintiff's headaches were controlled, and she reported to Dr. Jones "[t]he problem [was] improving." (Doc. 96, Dern Tr. 541:8–18; Joint Ex. 16 at 1.)[3]

Based on the testimony of the parties' experts and the literature offered at trial, including the Rady headache algorithms, the Court does not find Dr. Jones acted below the standard of care by failing to refer Plaintiff to a neurologist or for imaging at the March 30 visit.[4]

---

[3] Dr. Dern testified the guidelines in "Pediatric Headache: A Review" similarly indicate referral for imaging was not medically indicated. (*See* Doc. 96, Dern Tr. 542:24–547:12.) Plaintiff was not exhibiting the signs or symptoms necessitating imaging or referral because: (1) all of Plaintiff's neurological examinations (including on March 30) were normal and she was not experiencing seizures; and (2) as far as Dr. Jones knew between February 11, 2015 and August 31, 2016, Plaintiff had not experienced a recent onset of severe headache, a change in the type of headache, or any associated features suggesting neurological dysfunction. (Doc. 96, Dern Tr. 543:17–544:20. Plaintiff was also not experiencing any "red flags" suggesting the presence of a secondary headache (a headache suggesting some issue like a mass or bleeding in the body), such as the headache becoming more severe and/or frequent over time, sudden onset of severe headache, or systemic symptoms like fever, weight loss, rash, and joint pain. (Doc. 96, Dern Tr. 546:2–547:12.)

[4] Plaintiff's counsel elicited testimony from Dr. Contini that there would have been no risk for Dr. Jones to refer Plaintiff to a headache specialist on March 30, and the benefit of such a referral would have included "a more thorough evaluation by a specialist with a higher level of training in that area." (Doc. 91, Contini Tr. 298:11–23.) Dr. Dern similarly testified on cross examination she would not have been "critical" of Dr. Jones had she referred Plaintiff to a neurologist on March 30. (Doc. 96, Dern Tr. 615:22–25.) The Court rejects this argument, which is premised on medical hindsight. *See Vandi v. Permanente*

3:18-cv-00061-RBM-WVG

### 3. June 22, 2015 Visit

Dr. Contini did not specifically opine Dr. Jones violated the standard of care at the June 22 visit. Instead, when asked if he was critical of Dr. Jones's decision not to ask Plaintiff about her headaches, Dr. Contini testified he was, because "if the diagnosis is gastritis, and you know the patient is taking ibuprofen, then you need to at least consider the possibility that the ibuprofen is causing that gastritis. And if that's the case, then the question is why are you taking so much ibuprofen." (Doc. 91, Contini Tr. 308:10–20.) Dr. Dern testified the history Dr. Jones took on June 22 met the standard of care because Plaintiff's chief complaint at the visit was abdominal pain. (Doc. 96, Dern Tr. 561:9–18.) Dr. Dern further testified it was not necessary for Dr. Jones to evaluate Plaintiff's headaches on June 22 because Plaintiff did not complain about headaches at the time of the visit and headaches were not mentioned as a concern. (Doc. 96, Dern Tr. 561:23–562:2.) Because Dr. Contini did not opine Dr. Jones violated the standard of care at the June 22 visit, and based on Dr. Dern's testimony there was no indication for Dr. Jones to order imaging or a neurology referral following the June 22 visit (Doc. 96, Dern Tr. 566:15–20), the Court finds Plaintiff has failed to prove by a preponderance of the evidence Dr. Jones's treatment of Plaintiff at the June 22 visit fell below the standard of care.

### 4. August 8, 2016 Visit

Dr. Contini's testimony regarding the August 8 visit implicates Plaintiff's prescription refill requests for ibuprofen made on July 29 and August 1, 2016. (*See* Joint Ex. 21.) Dr. Jones denied both ibuprofen refill requests as it had been over a year since she had last seen Plaintiff, and she requested Plaintiff come in for an appointment. (Doc.

---

*Med. Grp., Inc.*, 9 Cal. Rptr. 2d 463, 467 (Cal. Ct. App. 1992) ("After a medical condition has been discovered it may be relatively easy to look back and identify a diagnostic procedure which would have revealed the condition but which was not medically indicated at the time. . . . At the time of treatment there may be dozens, perhaps even hundreds, of diagnostic procedures which could reveal a rare and unforeseen medical condition but which are not medically indicated.").

94, Jones Tr. 104:1–105:10; *see also id*.)

Dr. Jones stated at trial she did not discuss Plaintiff's headaches (or Plaintiff's prescription refill requests) with her at the August 8 visit, because Plaintiff's complaints at the visit were "abdominal pain and acne, and those are the complaints that I addressed." (Doc. 94, Jones Tr. 108:7–13.) Dr. Contini opined Dr. Jones's failure to ask Plaintiff about the requests for ibuprofen refills and her headaches fell below the standard of care. (Doc. 91, Contini Tr. 318:4–10.) He testified "the whole reason for this appointment to begin with, was that she -- Dr. Jones had denied medications and had requested that this patient come in. And so the first question should have been about the ibuprofen." (Doc. 91, Contini Tr. 318:12–17.)

On cross examination, Dr. Dern admitted it was Dr. Jones's responsibility to ask the patient why she sought multiple prescription refills. (Doc. 93, Dern Tr. 637:23–639:8.) When asked if the standard of care required Dr. Jones to inquire about the ibuprofen refills at the August 8 visit, Dr. Dern testified as follows:

> BY ATTORNEY SILBERBERG:
> Q. Doctor, did the standard of care require Dr. Jones to
> inquire why Shams needed ibuprofen on August 1st?
> A. (Pause.)
> Q. It's okay to say yes.
> A. Yeah. As she was refilling the medication that she had
> originally prescribed for her for that problem, yes.

(Doc. 93, Dern Tr. 641:2–8.)

Because both Dr. Contini and Dr. Dern agree the standard of care required Dr. Jones to inquire further about Plaintiff's prescription refill requests and/or Plaintiff's headaches, the Court finds Plaintiff has proven by a preponderance of the evidence Dr. Jones's treatment of Plaintiff at the August 8 visit fell below the standard of care.

### 5. *August 31, 2016 Visit*

Similar to his testimony regarding the February 11 and June 22 visits, Dr. Contini did not specifically opine Dr. Jones violated the standard of care at the August 31 visit.

Rather, when asked if, "in [his] view, from a pediatric standpoint, had earlier referrals of neuroimaging been done, they would have provided Shams with the opportunity for early -- earlier surgical intervention" and would such earlier surgical intervention "have avoided this catastrophic outcome," Dr. Contini testified in the affirmative. (Doc. 91, Contini Tr. 326:1–10.) Dr. Dern testified Dr. Jones met the standard of care by conducting a thorough history including a neurological examination of Plaintiff, instructing Plaintiff to return to the clinic with any new or worsening symptoms, and performing a full assessment and plan for Plaintiff. Dr. Dern further opined Dr. Jones did not breach the standard of care by failing to refer Plaintiff for a neurology consultation. (Doc. 96, Dern Tr. 582:10–12; 583:16–584:19.)

Dr. Contini's comments do not establish Dr. Jones breached the standard of care; rather, his opinions address instead to the alleged causation between Dr. Jones's treatment of Plaintiff and Plaintiff's eventual harm. Accordingly, Plaintiff has failed to establish a breach of the standard of care with respect to the August 31 visit.[5]

**B. Causation**

Having found Dr. Jones breached the standard of care by failing to inquire about Plaintiff's prescription refill requests and/or Plaintiff's headaches at the August 8 visit, the Court will next consider whether Plaintiff has demonstrated by a preponderance of the evidence the breach was a substantial factor in bringing about Plaintiff's harm. *Mayes*, 44 Cal. Rptr. 3d at 25. Plaintiff must provide sufficient evidence that "in the absence of the defendant's negligence, there was a reasonable medical probability the plaintiff would have obtained a better result." *Id*. The question for the factfinder is whether a reasonable person would consider Dr. Jones's breach of the standard of care to have contributed to Plaintiff's harm. *Id*. at 27.

---

[5] Plaintiff suggested throughout trial Dr. Jones altered or changed Plaintiff's medical records after the August 31 visit, upon learning of Plaintiff's ruptured aneurysm in September 2016. The Court finds this claim entirely without merit and not supported by the record.

Plaintiff has not demonstrated by a preponderance of the evidence a causal link between Dr. Jones's August 8 breach and Plaintiff's harm. Had Dr. Jones inquired about Plaintiff's prescription refill requests and/or Plaintiff's headaches at the August 8 visit, argues Plaintiff, Plaintiff and/or Ms. Aloos would have told Dr. Jones Plaintiff was waking up at night and vomiting due to headache pain. Had Dr. Jones learned Plaintiff was experiencing these symptoms, Dr. Jones would have referred Plaintiff to a neurologist or for imaging. (*See* Joint Ex. 69 (imaging indicated if concern for increased intracranial pressure, such as awakening from sleep with headache or vomiting).) Plaintiff argues such a referral or imaging would have alerted doctors to Plaintiff's giant aneurysm before it ruptured.

Plaintiff's medical records contradict this proposed causal link. Dr. Jones, Plaintiff, and Ms. Aloos did not discuss Plaintiff's headaches on August 8. But when Plaintiff returned to LMCHC three weeks later, on August 31, for her well child examination, Dr. Jones *did* discuss Plaintiff's headaches with the family, and no concerns about Plaintiff's headaches were raised by Plaintiff or Ms. Aloos. During Dr. Jones's examination of Plaintiff, Plaintiff reported "[n]o concerns today." (Joint Ex. 26 at 1.) Ms. Aloos indicated in Plaintiff's August 31 Pediatric Health History Form Plaintiff did not have any sleep problems and there were no questions or concerns about Plaintiff's health. (Joint Ex. 25 at 1, 3.) Plaintiff reported her abdominal pain had resolved, and she had "no pain now." (*Id.*) On the PHQ-9 form, Plaintiff reported no trouble falling or staying asleep, for a depression screening score of zero. (Joint Ex. 27.) Dr. Jones's full neurological exam, including testing cranial nerves, sense, reflexes, balance and gait, were all normal. (Joint Ex. 26 at 4.) Dr. Jones's impression of Plaintiff's migraines was "well controlled," and when asked how much pain she was experiencing on a scale of one to ten, Plaintiff reported "0" pain. (Joint Ex. 26 at 3, 5.) Plaintiff was instructed to continue to take ibuprofen as needed and to return to the clinic if her headaches worsened. (Joint Ex. 26 at 5.) Plaintiff did not report, nor did Dr. Jones's history or examination of Plaintiff reveal, any signs or symptoms necessitating referral for imaging or to a specialist as outlined in the Rady headache

algorithm, the "Pediatric Headache: A Review" article, or the expert testimony.

The August 31 visit alone, and Dr. Jones's compliance with the standard of care at the visit, undercuts Plaintiff's theory of causation. Even assuming Dr. Jones asked about Plaintiff's prescription refill requests and/or Plaintiff's headaches at the August 8 visit, however, the record does not suggest Plaintiff or Ms. Aloos would have shared with Dr. Jones information about Plaintiff awakening from sleep or vomiting due to headache pain, or raised any other concerns about Plaintiff's migraines. Plaintiff's sister, Talya Al Sabahi, who shared a bedroom with Plaintiff, testified in the three to five months prior to Plaintiff's ruptured aneurysm, Plaintiff would wake up at night, holding her head from headache pain, and the pain was so intense Plaintiff would bang on the bedroom wall with her other hand. (Doc. 94, Talya Al Sabahi Tr. 37:9–40:17.) Ms. Al Sabahi testified this occurred about five times in the three to five months prior to Plaintiff's ruptured aneurysm, and Plaintiff's headaches "once or twice at least" caused her to vomit. (Doc. 94, Talya Al Sabahi Tr. 40:19–22; 41:15–23.) Ms. Aloos similarly testified Plaintiff's headaches became more severe at the beginning of 2015, at which point Plaintiff started vomiting due to pain, and Plaintiff began to wake up at night due to her headaches around either the second (March 30) or third (June 22) visit to LMCHC. (Doc. 95, Aloos Tr. 456:3–11; 459:19–25.)

Despite Ms. Al Sabahi's and Ms. Aloos's testimony, Plaintiff's medical records reflect Dr. Jones was never informed—at any time during her care of Plaintiff—Plaintiff was awakening at night or vomiting due to headache pain. Focusing on the three-to-five-month period prior to Plaintiff's ruptured aneurysm (the period Ms. Al Sabahi testified Plaintiff was experiencing these symptoms), Plaintiff and/or Ms. Aloos had four contacts with LMCHC: (i) Ms. Aloos's August 4 call following the prescription refill denials; (ii) Plaintiff's August 8 visit with Dr. Jones; (iii) Plaintiff's August 31 visit with Dr. Jones; and (iv) Ms. Aloos's September 7 call requesting a referral to West Coast Eye Care. (Joint Exs. 22–29.) A concern of nighttime awakening or vomiting with pain was never shared with Dr. Jones or any other LMCHC employee. Plaintiff's records from her optometrist, Dr. Odish, similarly reflect no mention of vomiting or nighttime awakening with pain, despite

Plaintiff being seen by Dr. Odish on April 21, 2016, within the three-to-five-month period prior to Plaintiff's ruptured aneurysm, and despite Dr. Odish explicitly discussing Plaintiff's headaches with her. (Joint Ex. 20 at 1 (Plaintiff reported "[n]ot experiencing routine headaches or double vision.").) *See Vandi*, 9 Cal. Rptr. 2d at 467 ("[I]n treating a patient a physician can consider only what is known at the time he or she acts.").[6]

The Court further notes Plaintiff presented contradictory evidence at trial, arguing both that Dr. Jones's failure to discuss Plaintiff's headaches on August 8 was a breach of the standard of care, while also arguing Plaintiff and Ms. Aloos discussed Plaintiff's headaches with Dr. Jones at length. Ms. Aloos testified she informed Dr. Jones at either the March 30 or June 22 visit Plaintiff was waking up at night and vomiting due to headache pain, and she repeated this concern at the August 31 visit. (Doc. 95, Aloos Tr. 456:3–11; 459:19–25.) She also testified that, upon hearing of Plaintiff's nighttime awakening with headache pain, Dr. Jones said, "Don't worry. This is migraine. She's going to be okay. That's normal." (Doc. 95, Aloos Tr. 460:1–16.) Regarding the August 8 visit, Ms. Aloos testified the purpose of the visit was to discuss Plaintiff's increasingly severe headaches:

> Q. And you've testified that during this [August 8] visit, Shams told Dr. Jones that she was having headaches every day and vomiting sometimes twice a day; correct?
> A. I specifically told Dr. Jones that the headaches were getting worse. And the day that I called to make this appointment, to me was like an emergency. When I called them, I said it was an emergency, because in that particular day when I made the appointment, I noticed Shams vomited twice with -- and she had severe headaches. That's what I told Dr. Jones on that visit -- during that visit. So in one of those days prior to making -- prior to this appointment, she vomited twice.

---

[6] Dr. Dern testified as a practicing pediatrician, she would expect a 15-year-old patient, or the patient's mother, to inform her as the treating physician if the patient was experiencing headaches causing vomiting or nighttime awakening with pain. (Doc. 96, Dern Tr. 550:7–551:8.)

(Doc. 96, Aloos Tr. 474:25–475:10.) No mention of nighttime awakening or vomiting from headache pain appears in Plaintiff's medical records.

The Court credits Plaintiff's medical records as providing the best evidence of what happened during Plaintiff's visits to LMCHC. Unlike witnesses' memories, which may have altered in the nearly seven years since Plaintiff's ruptured aneurysm, Plaintiff's medical records were prepared contemporaneously, at or near the time of each visit. As the Supreme Court has cautioned, we can give "little weight" to testimony in conflict with contemporaneous documents. *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 396 (1948); *see also Cucuras v. Sec'y of Dep't of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993) ("Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium.").

The Court acknowledges what happened to Plaintiff, and by extension her family, is a tragedy. By all accounts, Plaintiff was an accomplished student at the time of her aneurysm. The Court acknowledges the sacrifice Plaintiff's family members have made to care for Plaintiff and attend to her needs following the aneurysm. Plaintiff has not proven by a preponderance of the evidence, however, that Dr. Jones's failure to inquire about Plaintiff's prescription refill requests and/or Plaintiff's headaches at the August 8 visit was a substantial factor in bringing about Plaintiff's harm. Because causation has not been proven within a reasonable degree of medical probability, the Court need consider the issue of Plaintiff's damages.

## IV. CONCLUSIONS OF LAW

Plaintiff has failed to establish her claim of medical negligence by a preponderance of the evidence. Although Plaintiff established Dr. Jones acted below the standard of care with respect to the August 8 visit, Plaintiff has not established Dr. Jones's failure to inquire further about Plaintiff's prescription refill requests and/or Plaintiff's headaches was a substantial factor in causing Plaintiff's harm.

Based on the foregoing, the Court finds in favor of Defendant United States of America. The Clerk of Court is directed to enter judgment according to this Order and close the case.

**IT IS SO ORDERED.**

DATE: March 23, 2023

_____
HON. RUTH BERMUDEZ MONTENEGRO
UNITED STATES DISTRICT JUDGE